FILED
U.S. DISTRICT COURT

2011 APR 22  P 12: 27

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

Rick L. Rose (5140)
Greggory J. Savage (5988)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, #1400
Salt Lake City, Utah  84111
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543

*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN INTERNATIONAL GROUP, INC. and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,<br><br>Defendants. | **COMPLAINT**<br><br><br><br><br>Case: 2:11cv00368<br>Assigned To : Benson, Dee<br>Assign. Date : 4/22/2011<br>Description: Associated Electric v. American International et al. 1 |

Plaintiff Associated Electric & Gas Insurance Services Limited complains of Defendants American International Group, Inc. and National Union Fire Insurance Company of Pittsburgh, Pa. and alleges as follows:

## THE PARTIES

1.      Plaintiff Associated Electric & Gas Insurance Services Limited ("AEGIS") is a non-assessable mutual insurance company owned by its policyholder-members based in Bermuda.

2.      Defendant American International Group, Inc. ("AIG") is an international insurance organization formed under the laws of the State of Delaware.  AIG provides insurance and conducts its operations through multiple line companies including its subsidiary, defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union").  Unless otherwise stated in this Complaint, AIG and National Union are collectively referred to herein as "AIG."

## JURISDICTION AND VENUE

3.      AEGIS and AIG are citizens of different states, and there is in excess of $75,000 in controversy in this matter.  Thus, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

4.      A substantial part of the events and actions giving rise to the claims asserted herein occurred in the State of Utah.  Moreover, AIG is subject to personal jurisdiction in this district.  Venue is therefore proper in this district and division pursuant to 28 U.S.C. § 1391(a).

## GENERAL ALLEGATIONS

5.      The Crandall Canyon Mine is an underground coal mine located in Emery County, Utah that was at all times relevant to this action jointly owned by Intermountain Power Agency ("IPA") and Andalex Resources, Inc ("ARI").  IPA and ARI each held a fifty percent

(50%) ownership interest in the mine.  The ownership relationship between IPA and ARI with respect to the Crandall Canyon Mine was governed by an agreement known as the Joint Ownership and Operating Agreement ("JOOA").

6.      IPA is an entity formed pursuant to the Utah Interlocal Cooperation Act.  The membership of IPA consists of 23 Utah municipalities that own electric utilities.  By agreement, the Los Angeles Department of Water and Power ("LADWP") is designated as the Operating Agent for IPA.  In this capacity and among other responsibilities, LADWP had responsibility for IPA's interest in the Crandall Canyon Mine.

7.      IPA and ARI entered into an agreement with Genwal Resources, Inc. ("GRI") to operate the Crandall Canyon Mine.  This agreement is known as the Contract Mining, Coal Sales and Loading Service Agreement.  GRI is a wholly-owned subsidiary of ARI.

8.      In a transaction completed in August 2006, ARI was acquired by UtahAmerican Energy, Inc. ("UEI").  UEI is a wholly-owned subsidiary of Murray Energy Corporation ("MEC").  This transaction did not change the terms or conditions of any of the existing agreements with respect to ownership and operation of the Crandall Canyon Mine.  GRI, ARI, UEI and MEC are collectively referred to herein as the "Murray Entities."

9.      During the period from July 31, 2007 to July 31, 2008, liability insurance for the operations at the Crandall Canyon Mine coverage was provided, in part, by an Excess Liability Insurance Policy, Policy No. X0229A1A07, issued by AEGIS (the "AEGIS Policy").  LADWP was the named insured in the AEGIS Policy.  Endorsement No. 10 to the AEGIS Policy amended the policy to include GRI, ARI and IPA as insureds under the policy "with respect to liability

3

imposed upon [GRI, ARI and/or IPA] as a result of the operations at Crandall Canyon [Mine]." The AEGIS Policy provided coverage of $35,000,000 per occurrence.

10.     With respect to the Crandall Canyon Mine, the AEGIS policy required that GRI, ARI, LADWP and IPA collectively maintain an underlying policy or self-insured retentions of not less than $1,000,000 per occurrence.

11.     MEC obtained a policy from Federal Insurance Company that provided coverage of $1,000,000 per occurrence with a $2,000,000 aggregate limit (the "Federal Policy").  MEC was the named insured under this policy as were, by endorsement, numerous other entities owned and/or controlled by MEC including UEI, ARI, GRI and the "CRANDALL CANYON PROJECT."  In a separate endorsement, LADWP, as the operating agent for IPA, was identified as a designated insured as were IPA's Board of Directors, other entities associated with IPA, the City of Los Angeles, and LADWP's Board of Commissioners, with respect to liability arising out of actions, or failures to act, by the insured Murray Entities.

12.     MEC also obtained a commercial umbrella policy from Lexington Insurance Company with limits of $2,000,000 per occurrence and in the aggregate (the "Lexington Policy").  The schedule of underlying insurance in the Lexington Policy identifies the Federal Policy.  The Lexington Policy provides that any person or organization named as an insured in an underlying policy, such as the Federal Policy, is an insured under the Lexington Policy.

13.     MEC further obtained a Commercial Umbrella Liability Policy from AIG, Policy No. BE 7250668, covering the time period June 1, 2007, through June 1, 2008 (the "AIG Policy").  The AIG Policy provided coverage of $23,000,000 per occurrence and in the

aggregate.  The schedule of underlying insurance in the AIG Policy identifies the Federal Policy.

MEC and, by endorsement, UEI, ARI and GRI are named insureds under the AIG Policy.  The

AIG Policy further states that any person or organization named as an insured in a scheduled

underlying policy, such as the Federal Policy, was an insured under the AIG Policy.

14.     On August 6, 2007, an event occurred at the Crandall Canyon Mine that trapped

six underground miners.  Extensive efforts to rescue the six trapped miner were immediately

undertaken by the Murray Entities under the direction of the Mine Safety and Health

Administration ("MSHA").

15.     On August 16, 2007, while rescue efforts were continuing, another event occurred

that resulted in the death of three rescuers and injuries to six others.

16.     MSHA immediately halted the rescue efforts and thereafter determined that the

conditions in the Crandall Canyon Mine were too dangerous to continue the rescue efforts

thereby preventing any chance for the recovery of the six trapped miners.  The Crandall Canyon

Mine was subsequently sealed.

17.     About eight months after the August 6th event, a miner who had been at the mine

at the time of the event committed suicide, allegedly as a result of Post-Traumatic Stress

Disorder resulting from the August 6th event.

18.     In the aftermath of the tragedy at the Crandall Canyon Mine, MSHA undertook an

investigation of events at that mine as did three separate congressional committees.

Additionally, the Inspector General of the Department of Labor undertook an investigation of

MSHA and the Governor of the State of Utah created by executive order the Utah Mine Safety

Commission as a result of the event at Crandall Canyon Mine. The Secretary of Labor also ordered an independent review of MSHA's actions with respect to events at the Crandall Canyon Mine.

19.     Ultimately, MSHA, the Inspector General, the independent reviewers, the Utah Mine Safety Commission, Congressman George Miller as Chair of the House of Representative Committee on Education and Labor, and Senator Edward Kennedy as Chair of the United States Senate's Health, Education, Labor and Pensions Committee all issued reports regarding events at the Crandall Canyon Mine.

20.     Additionally, in conjunction with its reports, MSHA issued twenty (20) citations to GRI and UEI as operators of the Crandall Canyon Mine.

21.     The injured rescuers and the families and heirs of the deceased miners and rescuers initiated three separate lawsuits in the state courts of Utah naming as defendants MEC, UEI, ARI, IPA, LADWP and Agapito Associates, Inc. (a mine engineering firm). GRI was also named as a defendant with respect to some of the claims.

22.     The lawsuits alleged that some or all of the defendants negligently, recklessly or intentionally failed to provide a safe mine; improperly decided where to mine; implemented unsafe mining methods; failed to prepare, review and follow proper mining plans, practices and procedures; failed to prepare, review and follow proper plans, practices, and procedures for roof control; failed to review and implement proper rock mechanics and geological studies and practices; and set and fostered attitudes promoting production and profit at the expense of safety.

The lawsuits further alleged that some or all of the defendants negligently, recklessly or intentionally implemented unsafe rescue plans and efforts following the August 6th event.

23.     Based on these allegations, the plaintiffs sought damages from all of the named defendants generally founded in claims of wrongful death and negligence.  The plaintiffs also asserted claims of strict liability for ultra-hazardous activities against MEC, UEI, ARI, IPA and LADWP; for premises liability against MEC, UEI, ARI, IPA and LADWP; and for infliction of emotional distress against MEC, UEI, and ARI.  Some plaintiffs also asserted these same claims against GRI as well as asserting a civil conspiracy claim against all of the named defendants.

24.     Shortly after the events of August 2007, IPA and LADWP gave notice under the Federal and AEGIS Policies that claims were likely to be made against them.  Notice was also provided on behalf of some or all of the Murray Entities.

25.     Pursuant to the terms of the Federal Policy, and under a reservation of rights, Federal Insurance accepted coverage and agreed to provide a defense for IPA, LADWP and the Murray Entities.

26.     AEGIS, subject to exhaustion of the $1,000,000 underlying limit and under a reservation of rights, accepted coverage for its insureds, IPA, LADWP, ARI and GRI.

27.     AEGIS rejected coverage for any of the other Murray Entities and for Robert Murray, the owner of MEC.

28.     Initial notice of the events at Crandall Canyon Mine was provided to AIG on August 17, 2007.  A formal notice of claim was provided to AIG on or about February 22, 2008.  Thereafter, AIG was kept apprised of the status of the ongoing litigation.  On information and

belief, AIG met with representatives of the Murray Entities on May 13, 2008.  On June 17 and 18, 2008, representatives of AIG participated with representatives of the other insurers and defense counsel in meetings in Salt Lake City, Utah.  During these meetings AIG was provided extensive background on the pending lawsuits and with contacts from whom AIG could seek additional information.  AIG was made aware of ongoing settlement discussions with the plaintiffs and the potential for a mediation in October or November 2008.  AIG was also frequently asked to communicate its coverage position but failed to do for a substantial period of time.

29.     In light of the ongoing settlement discussions and the potential for a mediation, the plaintiffs agreed not to formally serve the defendants with the complaints filed in the three lawsuits.

30.     The mediation with the plaintiffs was eventually scheduled for the week of November 17, 2008, in Salt Lake City, Utah.  AIG was aware of the scheduled mediation.

31.     Although AIG had previously been given notice of the claims arising out of events in August 2007 at the Crandall Canyon Mine, on August 26, 2008, counsel for LADWP sent a letter to AIG formally giving notice of loss and requesting coverage for LADWP under the AIG Policy.

32.     On October 13, 2008, counsel for IPA likewise sent a letter to AIG formally giving notice of loss and requesting coverage for IPA under the AIG Policy.  This notice was supplemented by a letter dated October 23, 2008.

33.     On October 22, 2008, a meeting was held in Salt Lake City, Utah to discuss the November mediation.  Representative of AIG, including its outside counsel, Mary McCurdy, participated in this meeting.

34.     During the October 22nd meeting, AIG recognized its continuing failure to provide a coverage position and promised that one would be forthcoming.

35.     By letter dated October 23, 2008, counsel for LADWP reiterated the need for AIG's coverage position and confirmed AIG's representation that it would be promptly provided.

36.     By letters dated November 11, 2008, counsel for IPA and counsel for LADWP again raised AIG's failure to provide its coverage position.

37.     On November 12, 2008, AIG's outside counsel responded to LADWP's counsel indicating for the first time that her representation was limited to claims for coverage of MEC and indicating that she had forwarded the November 11th correspondence "to AIG Domestic Claims and the claims professional and/or counsel handling LADWP's recent tender will respond to [the] correspondence."

38.     On November 17 through 22, 2010, a mediation occurred in Salt Lake City, Utah. Representative of all of the parties to the lawsuits as well as the defendants' insurance carriers participated in the mediation.  The parties where unable to reach a settlement during this mediation.

39.     In furtherance of settlement, both Federal and Lexington tendered the full policy limits of their respective policies during the mediation.

40.     AIG sent its outside counsel, Ms. McCurdy, to participate in the mediation.  Ms. McCurdy emphasized that AIG had not retained her with respect to the interests of either LADWP or IPA.  Thus, there was no representative of AIG present at the mediation who could address the claims of LADWP or IPA for coverage under the AIG Policy.

41.     Near the end of the mediation, through the efforts of counsel for the Murray Entities, LADWP and IPA were provided with the name of the individual at AIG who had been assigned to their claims, Charles Weber.  When contacted by counsel for IPA, Mr. Weber advised that he had just become involved in the matter and needed up to two weeks to provide AIG's coverage position.

42.     Counsel for LADWP and IPA continued to communicate with AIG requesting that AIG provide its coverage position and that AIG participate in a meeting with representatives of LADWP, IPA, the Murray Entities and AEGIS to discuss coverage issues in advance of a hoped for resumption of the mediation in February 2009.

43.     By letter dated December 19, 2008, addressed to IPA's counsel, AIG finally stated its position with respect to IPA's claim for coverage.  Among other things, AIG took the position that its investigation was ongoing but that IPA was not an insured with regard to any independent liability (i.e. liability not arising out of MEC's actions or inactions), that AIG had no obligation to defend or indemnify IPA and that any such obligation would not arise, if at all, until the entire limits available under the AEGIS Policy had been exhausted.  This letter was not received by IPA's counsel until December 29, 2008.

44.     By letter to LADWP's counsel dated December 22, 2008, AIG stated its position with respect to LADWP's claim for coverage.  The position was substantially similar to the position taken with respect to IPA.  This letter was not received by LADWP's counsel until December 29, 2008.

45.     By letter dated January 5, 2009, outside counsel for AIG, Patrick Fredette, reaffirmed AIG's position that the AIG had no obligation to defend and indemnify IPA until the entire limits available under the AEGIS Policy had been exhausted and provided "the information and law" supporting AIG's position.

46.     On January 6, 2009, representatives of LADWP, IPA, the Murray Entities, AEGIS and AIG met and agreed that the mediation could resume in March 2009.  For purposes of allowing the mediation to go forward, an agreement was reached as to how contributions to a settlement would be split among the insurance carriers.  However, both AEGIS and AIG reserved all rights with respect to payment of any settlement amounts.

47.     By letter dated March 3, 2009, counsel for IPA, on behalf of IPA and LADWP, advised AIG that they took issue with the position stated by AIG in its earlier letters and advised AIG that it had an obligation to provide coverage to IPA and LADWP and that AIG was required to contribute ratably with AEGIS to a resolution of the claims being asserted against IPA and LADWP.

48.     Within hours of  receipt of the March 3rd letter from IPA's counsel, AIG's outside counsel sent an e-mail to counsel for LADWP again stating AIG's position that AIG was not

obligated to provide any coverage under its policy unless and until the limits available under the

AEGIS policy had been exhausted.

49.    AIG's counsel followed his March 3rd e-mail with a letter to IPA's counsel dated

March 6, 2009, reiterating AIG's position that "at least $70 million would need to be provided

under the AEGIS policy for that policy's coverage before the coverage provided by the National

Union policy could be potentially implicated.  Therefore, for all of the foregoing reasons it

appears that any coverage provided by the National Union policy for the Crandall Canyon Mine

claims had not yet been implicated, and would not appear to be implicated based on known

demands."

50.    On March 10, 2009, a mediation of the Crandall Canyon Mine litigation resumed.

Following a lengthy mediation session and follow-up discussions over the subsequent days, a

settlement of the claims was reached on March 13, 2009.  During the mediation, representatives

of AEGIS and AIG took the lead on behalf the named defendants (other than the mine engineer)

and agreed to the terms of the settlement with the understanding that AEGIS and AIG would

contribute to the settlement as agreed at the January 6, 2009, meeting.

51.    The parties to the settlement thereafter sought to reduce the settlement to writing

which ultimately resulted in a Settlement Agreement with an effective date of May 22, 2009 (the

date on which it was signed by the last of the parties to the agreement).  The Settlement

Agreement provided that a substantial lump-sum payment would be made in settlement of the

claims against the Murray Entities, LADWP and IPA, with a separate payment being made to

settle the claims against the mine engineer.  The specific terms and conditions of the Settlement

Agreement are confidential but will be disclosed to the Court under seal, *in camera* or in such other manner as may be appropriate and necessary to protect the confidential nature of the agreement.

52.　　On or about October 16, 2009, in accordance with the terms and conditions of the Settlement Agreement, the settlement payment required by the agreement was delivered to the plaintiffs.

53.　　The settlement payment was funded in the following percentages:

　　　a.　　Seven percent (7%) under the Federal Policy on behalf of the Murray Entities, LADWP and IPA, which amount constituted the policy limits available under the Federal Policy;

　　　b.　　Seven percent (7%) under the Lexington Policy on behalf of the Murray Entities, LADWP and IPA, which amount constituted the policy limits available under the Lexington Policy;

　　　c.　　Eighteen percent (18%) under the AIG Policy on behalf of MEC and UEI;

　　　d.　　Thirty-four percent (34%) by IPA on behalf of itself and LADWP; and

　　　e.　　Thirty-four percent (34%) by ARI.

54.　　AIG did not contribute any amounts to the settlement on behalf of LADWP, IPA, ARI or GRI.

55.　　In accordance with the terms of the AEGIS Policy, AEGIS promptly reimbursed IPA and ARI for the full amounts that they respectively contributed to the settlement.

56.     With the settlement payment, the settlement was fully consummated and LADWP, IPA and the Murray Entities were released from all civil claims arising out or related to events at the Crandall Canyon Mine.

### FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

57.     AEGIS realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

58.     In response to LADWP's and IPA's demands for coverage of the claims asserted in the Crandall Canyon Mine litigation, AIG took the position that LADWP and IPA were not insured under the AIG Policy with regard to any independent liability (i.e. liability not arising out of MEC's actions or inactions).

59.     AIG further took the position that "at least $70 million would need to be provided under the AEGIS policy for that policy's coverage before the coverage provided by the National Union policy could be potentially implicated.  Therefore, for all of the foregoing reasons it appears that any coverage provided by the National Union policy for the Crandall Canyon Mine claims had not yet been implicated, and would not appear to be implicated based on known demands."

60.     AIG took this same position with respect to its obligations to provide coverage for ARI and GRI.

61.    Given these coverage positions, AIG refused to contribute any amounts to the settlement on behalf of LADWP, IPA, ARI and GRI resulting in AEGIS being forced to contribute more than its fair share to the settlement in order to protect the interest of its insureds.

62.    LADWP, IPA, ARI and GRI were insureds under the terms of the AIG Policy.

63.    The AIG and AEGIS Policies each contain excess or other insurance clauses and nothing in either policy suggests that one supercedes the other.

64.    Accordingly, the two excess or other insurance clauses effectively canceled each other out and AEGIS and AIG were obligated to contribute the settlement pro-rata in proportion to their respective policy limits.

65.    AIG did not contribute to the settlement pro-rata in proportion to the respective policy limits.

66.    AEGIS is therefore entitled to a judgment declaring that LADWP, IPA, ARI and GRI were insureds under the AIG Policy, that there are no limitations on the insured status of LADWP and IPA under the AIG Policy, that the AIG Policy was not excess to the AEGIS Policy such that AEGIS and AIG were obligated to contribute the settlement pro-rata in proportion to their respective policy limits, that AEGIS contributed more that its required share to the settlement of Crandall Canyon Mine litigation and that AIG is obligated to reimburse AEGIS the excess amount paid by AEGIS.

## SECOND CLAIM FOR RELIEF
### (Subrogation)

67.    AEGIS realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

68.    Due to the coverage positions taken by AIG and in order to protect its own interests and the interests of its insureds, LADWP, IPA, ARI and GRI, AEGIS paid more than its required share of the settlement of the Crandall Canyon Mine litigation.

69.    As a result of paying more than its required share, AEGIS effectively paid an obligation that AIG owed to LADWP, IPA, ARI and GRI.

70.    AIG knew that its coverage positions was disputed and AEGIS was not paying the additional amounts voluntarily but rather to protect its interests and the interests of its insured in getting the Crandall Canyon Mine claims settled.

71.    The settlement payment completely satisfied the Crandall Canyon Mine claims.

72.    AEGIS is entitled to judgment against AIG for the amount it paid in excess of its required amount which amount will be proven at the time of trial but is not less than $7,000,000.

## THIRD CLAIM FOR RELIEF
### (Contribution)

73.    AEGIS realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

74.    The AIG and AEGIS Policies each insured the same risks.  All of the entities insured under the AEGIS Policy (LADWP, IPA, ARI and GRI) were also insured under the AIG Policy.

75.     Both AIG and AEGIS were obligated to pay the amounts necessary to settle the Crandall Canyon Mine claims.

76.     AEGIS paid more than its required share of the settlement of the Crandall Canyon Mine claims.

77.     AEGIS is entitled to contribution from AIG for the amounts it contributed to the settlement that should have been contributed by AIG.

78.     AEGIS is entitled to judgment against AIG for an amount sufficient to equalize the common burden shared by AEGIS and AIG and to prevent AIG from profiting at the expense of AEGIS which amount will be proven at the time of trial but is not less than $7,000,000.

### FOURTH CLAIM FOR RELIEF
### (Equitable Indemnity)

79.     AEGIS realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

80.     By paying more than its share of the settlement of the Crandall Canyon Mine claims, AEGIS discharged a legal obligation owed by AIG to AIG's insureds.

81.     Allowing AIG to escape its obligations to its insureds would be inequitable.

82.     As between AEGIS and AIG, equity requires that AIG pay its required share of the settlement of the Crandall Canyon Mine claims.

83.     AEGIS is entitled to judgment against AIG for an amount sufficient to indemnify AEGIS for the amounts it inequitably paid to satisfy the obligations of AIG which amount will be proven at the time of trial but is not less than $7,000,000.

## FIFTH CLAIM FOR RELIEF
### (Unjust Enrichment)

84.     AEGIS realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

85.     By paying more than its share of the settlement of the Crandall Canyon Mine claims, AEGIS conferred a benefit on AIG.

86.     AIG knew that AEGIS was paying more than its required share of the settlement and that AIG was benefitting from AEGIS paying more that its share of the settlement.

87.     AIG accepted and was unjustly enriched by AEGIS paying more than its share of the settlement of the Crandall Canyon Mine claims.

88.     It is inequitable for AIG to retain the benefit of the payment made be AEGIS without paying for its value.

89.     AEGIS is entitled to judgment against AIG for an amount sufficient to disgorge AIG of the amount by which AIG has been unjustly enriched which amount will be proven at the time of trial but is not less than $7,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court order as follows:

1.     On AEGIS's First Claim for Relief, for a judgment declaring that LADWP, IPA, ARI and GRI were insureds under the AIG Policy, that there are no limitations on the insured status of LADWP and IPA under the AIG Policy, that the AIG Policy was not excess to the AEGIS Policy such that AEGIS and AIG were obligated to contribute the settlement pro-rata in

proportion to their respective policy limits, that AEGIS contributed more than its required share to the settlement of Crandall Canyon Mine litigation and that AIG is obligated to reimburse AEGIS the excess amount paid by AEGIS.

2.      On AEGIS's Second, Third, Fourth and Fifth Claims for Relief, for a judgment against AIG amount in an amount to proven at the time of trial but not less than $7,000,000.

3.      For an award of prejudgment interest, attorney's fees and costs to the fullest extent provided for by law.

4.      For such other and further equitable relief as the Court deems just and equitable.

DATED this 22nd day of April, 2011.

RAY QUINNEY & NEBEKER P.C.

Rick L. Rose
Greggory J. Savage
*Attorneys for Plaintiff*

1126118

19