**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN INTERNATIONAL GROUP, INC. and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., <br><br> Defendants. | MEMORANDUM DECISION AND ORDER <br><br><br> Case No. 2:11-cv-00368-RJS <br><br> Judge Robert J. Shelby |

This is a dispute between insurance companies. Associated Electric & Gas Insurance Services (AEGIS) seeks reimbursement from National Union Fire Insurance Company for settlement payments arising out of three underlying lawsuits. The parties have filed cross-motions for summary judgment. AEGIS has also filed a Rule 56(d) motion. For the reasons stated below, the court grants in part and denies in part AEGIS's and National Union's motions for summary judgment, and grants in part AEGIS's Rule 56(d) Motion.

**BACKGROUND**

The Crandall Canyon Mine was a coal mine in Emery County, Utah. Intermountain Power Agency, Inc. (IPA) owned a fifty-percent share in the mine and designated Los Angeles Department of Water and Power (LADWP) as its operating agent with primary responsibility for its interest. Andalex Resources, Inc. owned the other fifty-percent share and its subsidiary,

1

Genwal Resources, Inc., operated the mine. Andalex is a subsidiary of UtahAmerican Energy, which is a subsidiary of Murray Energy Corporation.

In 2007, the mine collapsed. Six miners and three rescue workers died and at least six other rescue workers were injured. The injured rescue workers and the families of the deceased individuals sued Murray Energy, UtahAmerican, Andalex, IPA, LADWP, and Agapita Associates, Inc. (a mine engineering firm). In all, there were three underlying lawsuits. The plaintiffs' claims were generally based on negligence and wrongful death.

All three lawsuits were resolved in May 2009 as part of a global settlement agreement. Four different insurance companies contributed to the settlement:

> **(1) Federal Insurance Company**: Murray Energy held a policy with Federal Insurance, which provided coverage of $1,000,000 per occurrence with a $2,000,000 aggregate limit. The policy listed Murray Energy as the named insured; an endorsement listed UtahAmerican, Andalex, and Genwal as named insureds. A separate endorsement listed the IPA board of directors, LADWP, the City of Los Angeles, and LADWP's board of directors as additional insureds. Federal Insurance contributed 7% of the settlement on behalf of Murray Energy, UtahAmerican, Andalex, Genwal, LADWP, and IPA.
>
> **(2) Lexington Insurance Company**: Murray Energy also held a commercial umbrella policy from Lexington Insurance with a limit of $2,000,000 per occurrence and in the aggregate. The Lexington Policy's schedule of underlying insurance identified the Federal Policy. The Lexington Policy also stated that it covered any person or organization named as an insured in an underlying policy. Thus, the parties named as insureds in the Federal Policy were also insured under

the Lexington Policy. Additionally, an endorsement in the Lexington Policy named Andalex and Genwal as insured parties. Lexington Insurance contributed 7% of the settlement on behalf of Murray Energy, UtahAmerican, Andalex, Genwal, LADWP, and IPA.

**(3) National Union Fire Insurance Company**: Murray also held a commercial umbrella policy from National Union that provided coverage of $23,000,000 per occurrence and in the aggregate. In part, the policy covered "any person or organization, other than the Named Insured, included as an additional insured under Scheduled Underlying Insurance."[1] The schedule of underlying insurance identified the Federal Policy, meaning the National Union Policy covered additional insureds listed in the Federal Policy. By endorsement, the National Union Policy also named UtahAmerican, Andalex, and Genwal. National Union contributed 18% of the settlement on behalf of Murray Energy and UtahAmerican.

**(4) AEGIS**: LADWP held an excess liability policy from AEGIS, which provided coverage of $35,000,000 per occurrence. The AEGIS Policy, by endorsement, named as insureds Genwal, Andalex, and IPA with respect to liability involving the Crandall Canyon Mine. AEGIS contributed 68% of the settlement on behalf of IPA, LADWP, and Andalex.

In this lawsuit, AEGIS seeks reimbursement from National Union for settlement payments made on behalf of IPA, LADWP, and Andalex. To determine how to properly allocate liability between AEGIS and National Union, it is necessary to consider the insuring agreements and other-insurance clauses in the respective policies. The table below compares the policies.

---

[1] National Union Ins. Policy (Dkt. 63, exh. 1), at 31.

| AEGIS Policy | National Union Policy |
|---|---|
| The Insuring Agreement of the AEGIS Policy provides:<br><br>*Limits of Liability*<br><br>(1) The COMPANY shall only be liable hereunder for ULTIMATE NET LOSS in excess of the UNDERLYING LIMITS as stated in Item 6A or 6B of the Declarations, which is applicable.<br><br>(2) The maximum amount payable by the COMPANY for ULTIMATE NET LOSS arising out of any one occurrence shall be the amount stated in Item 5A of the Declarations.<br>_____<br><br>ULTIMATE NET LOSS is defined as the total INDEMNITY and DEFENSE COSTS with respect to each OCCURRENCE to which this POLICY applies.<br><br>_____<br><br>INDEMNITY is defined as:<br><br>all sums which the INSURED shall become legally obligated to pay as damages, including punitive damages where permitted by law, either by adjudication or compromise with the consent of the COMPANY, after making proper deductions for all recoveries and salvages collectible and *for other insurance* as provided for in CONDITION (H) HEREOF.<br><br>_____<br><br>The Other Insurance provision in CONDITION (H) states:<br><br>If other valid and collectible insurance with any other insurer . . . is available to the INSURED covering a CLAIM also covered by this POLICY, other than insurance that is issued specifically as insurance in excess of the insurance afforded by this POLICY, this POLICY *shall be in excess of and shall not contribute with such other insurance*. Nothing herein shall be construed to make this POLICY subject to the terms of other insurance. | **2. National Union's Insuring Agreement and "Other Insurance" Clause**<br><br>The National Union Insuring Agreement provides:<br><br>We will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the insured becomes legally obligated to pay as damages by reason of liability imposed by law because of **Bodily Injury** . . . to which this insurance applies or because of **Bodily Injury** . . . to which this insurance applies assumed by the **Insured** under an **Insured Contract**.<br><br>_____<br><br>Under definitions Z **Retained Limit** means:<br><br>1. the total applicable limits of **Scheduled Underlying Insurance** [including the Federal Policy and Lexington Policy] and any applicable **Other Insurance** providing coverage to the **Insured** . . . .<br>_____<br><br>The Other Insurance provision provides:<br><br>If other valid and collectible insurance applies to damages that are also covered by this policy, this policy will apply excess of the Other Insurance. However, this provision will not apply if the Other Insurance is specifically written to be excess of this policy. |

Based on the parties' stipulation, there are two phases in this litigation.[2] In this first phase, the parties have limited their discovery and summary judgment motions to issues surrounding the interpretation of the insurance policies. Additional issues, including factual disputes surrounding the mine collapse and resulting injuries, are reserved for the second phase.

## ANALYSIS

The parties dispute (1) whether the National Union Policy covers IPA, LADWP, and Genwal; (2) whether the National Union Policy is excess to the AEGIS Policy; and (3) whether National Union must reimburse AEGIS the excess amount AEGIS contributed to the settlement. Neither party disputes that the National Union Policy covers Andalex, which is a named insured.[3] The court first lays out the applicable legal standard then takes up the disputed issues.

### I. Legal Standard

The court grants summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] The court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party."[5]

### II. Insured Status of LADWP, IPA, Andalex, and Genwal

The parties dispute whether the National Union Policy covers IPA, LADWP, and Genwal. To determine if the insurance policies provide coverage, the court applies principles of contract interpretation to the relevant policies.[6]

---

[2] Dkt. Nos. 51-52.
[3] National Union Ins. Policy (Dkt. 63, exh. 1), at 40; MFSJ Hearing Transcript (Dkt. 108), at 15, ¶¶ 2-7.
[4] Fed. R. Civ. P. 56(a).
[5] *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).
[6] *See Farmers Ins. Exch. v. Versaw*, 99 P.3d 796, 800 (Utah 2004).

### a. IPA

The IPA board of directors is named by endorsement as an additional insured in the Federal Policy. The National Union Policy's schedule of underlying insurance identifies the Federal Policy in its schedule of underlying insurance, meaning any additional insured under the Federal Policy is insured under the National Union Policy. The Federal Policy states that an additional insured is covered "only with respect to their liability arising out of your acts or failure to act."[7] The terms "you" and "your" in the contract refer to named insureds.[8] Therefore, an additional insured is covered for liability arising out of a named insured's acts or failure to act.

AEGIS argues that the fact the Federal Insurance Company acknowledged coverage of IPA, LADWP, and Genwal is significant, if not dispositive. In other words, because the company that drafted the Federal Policy acknowledged coverage by paying the policy limits toward the settlement, the court should find that the National Union Policy also provides coverage. But Federal Insurance acknowledged coverage under a reservation of rights: "Federal reserves all of its rights including the right to rely upon all policy provisions to amend its coverage position in the event new information is obtained."[9] In view of the reservation of rights, the fact that Federal Insurance acknowledged coverage is not significant to the contract interpretation.

AEGIS also argues that (1) the Federal Policy covers IPA without limitation because the additional-insured clause is ambiguous and thus favors coverage, (2) IPA is covered for liability arising out of the Crandall Canyon Project, which is a named insured, and (3) IPA is covered under the Federal Policy's blanket endorsement.

---

[7] Federal Ins. Policy (Dkt. 63, exh. 3), at 5234
[8] *Id.* at 5157.
[9] Letter from Thomas M. Correll, Counsel for Federal Insurance Company, to Avery Neaman, LADWP Risk Department (Feb. 22, 2008) (Dkt. 98, exh. 1), at 3703-04.

### (1)  Coverage for IPA's Own Acts or Failure to Act

AEGIS argues that the Federal Policy covers IPA (and LADWP) for IPA's acts or failure to act.  To support its argument, AEGIS cites *Marathon Ashland Pipe Line LLC v. Maryland Casualty Company*[10] and *McIntosh v. Scottsdale Ins. Co.*,[11] in which the Tenth Circuit addressed a Who Is An Insured clause that stated additional insured were covered "only with respect to liability arising out of your ongoing operations performed for that insured."[12]  The court found in both cases that the clause was ambiguous because it was unclear "as to whose negligence is excluded from coverage."[13]  The Federal Policy is different, however.  Unlike the clause at issue in *Marathon* and *McIntosh*, the Federal Policy clause is unambiguous.  The *Marathon-McIntosh* clause does not specify which party must cause the liability.  In other words, liability may arise out of the additional insured's acts in connection with named insured's ongoing operations.  Similarly, a named insured can cause liability in connection with its same ongoing operations.  Further, the court in *Marathon* also determined that the policy did not clearly define the term "you," which made it unclear whether the Who Is An Insured clause applied to named insureds or additional insureds.[14]

The Federal Policy, on the other hand, clearly defines the terms "you" and "your" and specifies whose acts will trigger coverage.  "You" and "your" refer to a named insured.  Further, the policy states that it covers additional insureds "only with respect to their liability arising out of your acts or failure to act."  This provision is unambiguous: coverage exists for liability arising out of a named insured's acts or failure to act.  Unlike the *Marathon-McIntosh* clause, the clause here does not leave open the possibility that the policy covers an additional insured's acts.

---

[10] 243 F.3d 1232 (10th Cir. 2001).
[11] 992 F.2d 251 (10th Cir. 1993).
[12] *Marathon Ashland Pipe Line LLC*, 243 F.3d at 1236-43; *McIntosh*, 992 F.2d at 254-56.
[13] *Marathon Ashland Pipe Line LLC*, 243 F.3d at 1240; *McIntosh*, 992 F.2d at 254-56.
[14] *Marathon Ashland Pipe Line LLC*, 243 F.3d at 1240-41.

*(2) The Crandall Canyon Project*

AEGIS argues that the Federal Policy covers IPA based on the Crandall Canyon Project's status as a named insured. The Crandall Canyon Project is a named insured covered for general liability.[15] It also states, in reference to named insureds, "If you are a partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business."[16] Under Utah law, the Crandall Canyon Project constitutes a joint venture between IPA, Andalex, and Genwal.[17] The Crandall Canyon Project is a joint venture, not an entity. Therefore, the Federal Policy covers IPA for the joint venturers' acts or failures to act.

But exclusions apply. In the Federal Policy, an exclusion states, "No one is insured for the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a named insured in the Declarations."[18] Murray Energy is the only named insured in the declarations. On its face, the Federal Policy excludes coverage for the Crandall Canyon Project joint venture even though the Crandall Canyon Project is a named insured. It is unclear why the parties listed a joint venture as a named insured only to preclude coverage through the joint venture exclusion. It is clear, however, that the policy does just that. The exclusion's plain language is unambiguous. And the court is not in a position to speculate about the parties' intentions when negotiating the contract. Rather, the court's analysis is confined when presented

---

[15] Federal Ins. Policy (Dkt. 63, exh. 3), at 5219.
[16] *Id.* at 5157.
[17] *See Ellsworth Paulsen Const. Co. v. 51-SPR-L.L.C.*, 183 P.3d 248, 252 (Utah 2008); *Bassett v. Baker*, 530 P.2d 1, 2 (Utah 1974). Utah law defines a joint venture as "an agreement between two or more persons ordinarily but not necessarily limited to a single transaction for the purpose of making a profit." "The parties must combine their property, money, effects, skill, labor and knowledge. As a general rule, there must be (1) a community of interest in the performance of the common purpose, (2) a joint proprietary interest in the subject matter, (3) a mutual right to control, (4) a right to share in the profits, and (5) unless there is an agreement to the contrary, a duty to share in any losses which may be sustained." *Id.* at 252.
[18] Federal Ins. Policy (Dkt. 63, exh. 3), at 5158.

with unambiguous contractual language. Here, the contract expressly limits coverage for joint ventures to named insureds listed in the declarations. Because the Crandall Canyon Project is not listed in the declarations, its joint venturers are not covered under the Federal Policy.

What's more, even if the Federal Policy covered IPA under the Crandall Canyon Project joint venture, the National Union Policy excludes joint ventures that are not listed in its declarations: "no person or organization is an Insured with respect to the conduct of any current, past or newly formed partnership, joint venture or limited liability company that is not designated as a Named Insured in Item 1 of the Declarations." The National Union Policy does not list Crandall Canyon Project at all, let alone in its declarations. In sum, exclusions in both the Federal Policy and National Union Policy preclude coverage for joint ventures that are not listed in the policies' respective declarations.

*(3) The Blanket Endorsement*

AEGIS also argues that IPA is covered under the Federal Policy blanket endorsement, which states:

> THE WHO IS AN INSURED PROVISION IS AMENDED TO INCLUDE ANY PERSON OR ORGANIZATION YOU ARE REQUIRED BY WRITTEN CONTRACT TO INCLUDE AS AN INSURED, INSURANCE SHALL BE LIMITED TO THE EXTENT OF COVERAGE AND LIMITS OF LIABILITY REQUIRED BY THE WRITTEN CONTRACT. THE WRITTEN CONTRACT MUST BE EXECUTED PRIOR TO THE OCCURRENCE OF ANY LOSS. THE EXTENT OF COVERAGE AND THE LIMITS OF LIABILITY OF SUCH CONTRACT SHALL NOT INCREASE THE LIMITS STATED IN SECTION III – LIMITS OF INSURANCE OR THE EXTENT OF COVERAGE IN THIS POLICY.

AEGIS maintains that the Federal Policy covers LADWP and that LADWP had a contractual obligation to obtain insurance coverage for IPA. As explained below, however, the Federal Policy does not cover LADWP. Thus, the blanket endorsement does not apply to IPA.

In view of the above discussion, the Federal Policy and National Union Policy do not cover IPA.

### b. LADWP

LADWP is named as an additional insured in the Federal Policy and, similar to IPA, the Federal Policy does not cover LADWP. AEGIS makes three arguments contending the Federal Policy covers LADWP. The first two arguments are the same as those advanced for coverage of IPA, discussed above: (1) the additional-insured clause is ambiguous and thus favors coverage and (2) LADWP is covered for liability arising out of the Crandall Canyon Project. For the reasons previously stated, these arguments fail.

The third argument is that the Federal Policy covers LADWP due to IPA's contractual obligation to pay for LADWP's liability. The Federal Policy states, "Subject to all of the terms and conditions of this insurance, we will pay damages that the insured becomes legally obligated to pay by reason of liability: . . . assumed in an insured contract; for bodily injury or property damage caused by an occurrence to which this coverage applies."[19] AEGIS argues that IPA and LADWP had an insured contract wherein IPA agreed to pay for LADWP's liability. AEGIS then argues that, because the Federal Policy covers IPA, it also covers LADWP. But the Federal Policy does not cover IPA, making this argument ineffective. The Federal Policy does not cover LADWP.

### c. Genwal

Genwal is named in the National Union Policy. An exclusion applies, however, that states the policy does not cover "Bodily Injury, Property Damage or Personal Injury and Advertising Injury arising out of the operations of . . . Genwal Resources, Inc."[20] The exclusion

---

[19] *Id.* at 5171.
[20] National Union Ins. Policy (Dkt. 63, exh. 1), at 39.

does not apply if an insurance policy listed in the schedule of underlying insurance covers "Bodily Injury or Property Damage arising out of Automobile Liability or Employers' Liability."[21]  If there is such a policy, "[c]overage under [the National Union Policy] for such Bodily Injury or Property Damage will follow the terms, definitions, conditions and exclusions of Scheduled Underlying Insurance . . . ."[22]  The policy further states that "coverage provided by this policy will be no broader than the coverage provided by Scheduled Underlying Insurance."[23]  AEGIS points out that the National Union Policy's schedule of underlying insurance lists an employer's liability policy issued by Rockwood Casualty Insurance Company that covers Genwal.[24]  Regardless of the Rockwood Policy's terms, it does not provide complete coverage to Genwal: the National Union Policy states that an underlying policy will only provide coverage for bodily injury or property damages arising out of automobile or employers' liability.  And because AEGIS does not provide details about the Rockwood Policy or present argument that liability arose from automobile or employers' liability, the court cannot find that the National Union Policy covers Genwal on this basis.

At bottom, the National Union Policy does not cover Genwal for liability related to the mine.  However, as stated above, the Federal Policy covers damages that an insured pays for liability assumed in an insured contract.[25]  The policy defines an insured contract as "any other contract or agreement pertaining to your business . . . in which you assume the tort liability of another person or organization to pay damages, to which this insurance applies, sustained by a third person or organization."[26]  Here, IPA and Andalex contracted to pay for Genwal's liability related to the mine.  This contract constitutes an insured contract: IPA and Andalex agreed to pay

---

[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.* at 8.
[25] Federal Ins. Policy (Dkt. 63, exh. 3), at 5171.
[26] *Id.* at 5192.

for liability arising out of the mine. And the Federal Policy covers such liability caused by the mine collapse. To be clear, Andalex is an insured under the Federal Policy and IPA is not. Accordingly, AEGIS may seek reimbursement for settlement payments that it made on Andalex's behalf, which includes any payments Andalex made on Genwal's behalf pursuant to the parties' agreement.

## III. Priority of Coverage

Neither party disputes that both the National Union Policy and AEGIS Policy cover Andalex.[27] The next issue is whether the National Union and the AEGIS Policy provide concurrent coverage at the same level. The court concludes that (1) the policies provide the same level of coverage, (2) the policies' other-insurance clauses conflict and therefore cancel each other out, and (3) AEGIS can seek reimbursement for a pro rata portion of settlement payments made on Andalex's behalf.

### a. Level of Coverage

When allocating liability among insurers, courts look to the policies' other-insurance clauses.[28] At the outset, National Union contends that the AEGIS Policy is a first-level excess policy, along with the Lexington Policy, and that the National Union Policy provides second-level coverage. Taking these points in reverse order, a comparison of the Lexington and AEGIS policies reveals that the latter is excess to the former. The Lexington Policy's other-insurance clause states, "If other valid and collectible insurance applies to damages that are also covered by this policy, this policy will apply excess of the 'other insurance'. However, this provision will

---

[27] National Union Ins. Policy (Dkt. 63, exh. 1), at 40; MFSJ Hearing Transcript (Dkt. 108), at 15, ¶¶ 2-7.
[28] *See Utah Power & Light v. Federal Ins. Co.*, 983 F.2d 1549, 1559 (10th Cir. 1993) (considering other insurance clauses when determining priority of coverage); LEE R. RUSS & THOMAS F. SEGALLA, 15 COUCH ON INSURANCE § 217:4 (3d ed. 2011); *see also Sharon Steel Corp. v. Aetna Cas. & Sur. Co.*, 931 P.2d 127, 140 (Utah 1997) ("In single incident cases, courts generally prorate according to the policy limits where multiple policies shared the same risk but had inconsistent 'other insurance' clauses.").

not apply if the other insurance is specifically written to be excess of this policy."[29] The AEGIS Policy's other-insurance clause states, "If other valid and collectible insurance with any other insurer . . . is available to the INSURED . . . this POLICY shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this POLICY subject to the terms of other insurance."[30] The AEGIS clause is broader. Unlike the Lexington Policy, the AEGIS Policy states that it "shall not contribute" with other insurance policies. The AEGIS Policy is therefore excess to the Lexington Policy.

National Union also contends that its policy is an umbrella, which renders it excess to any other policy, including the AEGIS Policy. The Utah Supreme Court has stated that "[u]mbrella policies widen the scope of coverage" and are often referred to as excess policies.[31] But "[t]rue excess policies do not broaden the underlying coverage—they merely increase the amount of coverage available to compensate for a loss."[32] The AEGIS Policy does more than merely increase the dollar amount of coverage. Rather, it provides coverage for a number of risks related to LADWP's operations, including pollution, medical malpractice, and failure to supply gas, electricity, water, steam, or telephone services.[33] Consequently, under Utah law, the AEGIS Policy can be considered an umbrella. In any event, it is inaccurate to label the AEGIS Policy as an excess policy based solely on its title.

National Union further contends that its policy is excess to the AEGIS Policy by pointing to the disparity in premium amounts. The AEGIS Policy premiums were almost three times larger than the National Union Policy premiums. National Union cites to various court decisions and secondary sources to argue that larger premiums indicate that an insurance policy is an

---

[29] Lexington Ins. Co. Policy (Dkt. 63, exh. 4), at 5653.
[30] AEGIS Policy (Dkt. 63, exh. 2), at 1132.
[31] *Benjamin v. Amica Mut. Ins. Co.*, 140 P.3d 1210, 1217 (Utah 2006).
[32] *Id.* (internal quotations omitted).
[33] AEGIS Policy (Dkt. 63, exh. 2), at 1132.

umbrella and thus excess to other policies.[34] This approach, however, has not been adopted by Utah courts. And it is doubtful that such an approach would be applicable when the policies provide different coverage.[35] As stated, the AEGIS Policy covers the operations of LADWP, which is the largest municipal utility in the country. Conversely, the National Union Policy provides coverage only for the Crandall Canyon Mine's operation. Because the AEGIS Policy provides different coverage, the difference in premiums is not dispositive.

### b. Other-Insurance Clauses and Pro Rata Share of Liability

Next, the court examines the policies' other-insurance clauses to determine whether they conflict. There are three types of other-insurance clauses: pro rata, excess, and escape. Both the AEGIS and National Union other-insurance clauses are excess clauses, meaning they purport to make their respective policies excess to all other policies. This creates a conflict. Utah case law does not address the situation in which two policies covering the same risk have conflicting other-insurance clauses. The majority rule is that the clauses are deemed mutually repugnant and cancel each other out, making each insurer liable for a pro rata share of the loss based on comparison of the policy limits.[36] In short, courts ordinarily treat conflicting excess clauses as pro rata clauses.

---

[34] *See, e.g.*, *United States Fid. & Guar. Ins. Co. v. Commercial Union Midwest Ins. Co.*, 430 F.3d 929, 934 (8th Cir. 2005); *Institute for Shipboard Educ. v. Cigna Worldwide Ins. Co.*, 22 F.3d 414, 426 (2d Cir. 1994); *Truehart v. Blandon*, 884 F.2d 223, 227 n.10 (5th Cir. 1989); *Garmany v. Mission Ins. Co.*, 785 F.2d 941, 947 (11th Cir. 1986); *Fried v. North River Ins. Co.*, 710 F.2d 1022, 1026 (4th Cir. 1983); *Illinois Emcasco Ins. Co. v. Continental Casualty Co.*, 139 Ill. App. 3d 130, 133 (Ill. Ct. App. 1985); 8A APPLEMAN, INSURANCE LAW & PRACTICE §4906, at 348 (1981).

[35] *See Reliance Ins. Co. v. St. Paul Surplus Lines Ins. Co.*, 753 F.2d 1288, 1291 (4th Cir. 1985). In *Reliance*, the Fourth Circuit held, "Prorating on the basis of premiums paid, however, also has been criticized on the grounds that unless the policies provide identical coverage, many variables may effect the amount of premium charged thereby making the amount of premium received an inaccurate reflection of the insurer's ultimate obligation." *Id.*

[36] *See, e.g.*, *Indiana Ins. Co. v. Mission Nat. Ins. Co.*, 874 F.2d 631 (9th Cir. 1989); *Employers Cas. Co. v. Employers Commercial Union Ins. Co.*, 632 F.2d 1215 (5th Cir. 1980); *Hennes Erecting Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 813 F.2d 1074 (10th Cir. 1987); *Progressive Cas. Ins. Co. v. Travelers Ins. Co.*, 735 F. Supp. 15 (D. Me. 1990); 15 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 219:47 (3d ed. 2011) (citing cases).

Both policies purport to be excess to any other policy.  The policies' insuring terms state that they are responsible only for amounts in excess of the ultimate net loss or retained limit, meaning the amount above primary insurers' and any other insurers' limits.  To determine priority of coverage between the competing excess policies, the court must determine whether the policies' other-insurance clauses conflict.  The table below compares the other-insurance clauses.

| AEGIS Policy | National Union Policy |
| --- | --- |
| If other valid and collectible insurance with any other insurer . . . is available to the INSURED covering a CLAIM also covered by this POLICY, other than insurance that is issued specifically as insurance in excess of the insurance afforded by this POLICY, this POLICY shall be in excess of and shall not contribute with such other insurance.  Nothing herein shall be construed to make this POLICY subject to the terms of other insurance. | If other valid and collectible insurance applies to damages that are also covered by this policy, this policy will apply excess of the Other Insurance. However, this provision will not apply if the Other Insurance is specifically written to be excess of this policy. |

The clauses conflict and cancel one another out: both state that their respective policies are in excess to other insurance policies and neither indicates that it is excess to the other.  Also, neither policy lists the other in its underlying limits schedule.  The clauses cannot be reconciled and therefore are mutually repugnant.  In view of this, the parties must contribute pro rata shares to the settlement payments AEGIS made on Andalex's behalf according to the respective policy limits.

### c.  Subrogation

AEGIS also argues that it is entitled to a pro rata share of the settlement payment under the equitable principle of subrogation.  To obtain subrogation, the party seeking reimbursement (the subrogee) must show that: (1) there is a debt or obligation for which the subrogee was not

15

primarily liable; (2) the subrogee must have made payment to protect his own rights or interest; (3) the subrogee must not have acted merely as a volunteer; and (4) the entire debt must have been paid.[37]

In view of the discussion above, AEGIS satisfies each element. First, AEGIS was not liable for paying 68% of the settlement. That is, National Union is obligated to pay a pro rata share of the settlement payments that AEGIS made on Andalex's behalf. Second, AEGIS was certainly liable to pay at least some of the settlement and thus needed to pay its portion to protect its interest. If AEGIS declined to contribute, it would have been exposed to claims from other parties. Third, AEGIS did not act voluntarily. A party is not a volunteer when it acts "in good faith to discharge a disputed obligation . . . [even] if it is ultimately determined that its policy did not apply."[38] AEGIS made the settlement payment amidst a coverage dispute and reserved its right to pursue reimbursement from National Union. Therefore, it was not a volunteer. Fourth, AEGIS's entire indemnification obligation was satisfied by the settlement payment.

## IV. Closer-to-the-Risk Doctrine

Under the closer-to-the-risk doctrine, policies that are purchased to cover specific liabilities are primary to policies providing more general liability coverage.[39] Utah courts have not adopted the doctrine. A federal court sitting in diversity is to "ascertain and apply the most recent statement of state law by the state's highest court."[40] The Tenth Circuit has stated, "[W]e are generally reticent to expand state law without clear guidance from its highest court."[41] Here,

---

[37] *State Farm Mutual Auto. Ins. Co. v. Northwestern National Ins. Co.*, 912 P.2d 983, 986 (Utah 1996).
[38] *Id.* at 983.
[39] *See, e.g.*, *Am. Family Ins. v. Nat'l Cas. Co.*, 515 N.W.2d 741, 745 (Minn. Ct. App. 1994); *Transamerican Ins. Co. v. Austin Farm Ctr., Inc.*, 354 N.W.2d 503, 508 (Minn. Ct. App. 1984); STEVEN PLITT ET AL., 15 COUCH ON INSURANCE § 219:52.
[40] *Proctor & Gamble v. Haugen*, 222 F.3d 1263, 1280 (10th Cir. 2000) (internal citations and quotations omitted).
[41] *Taylor v. Phelan*, 9 F.3d 882, 887 (10th Cir. 1993).

there is no indication that the Utah Supreme Court has adopted the closer-to-the-risk doctrine and this court declines to apply it.

## IV. Rule 56(d) Motion

AEGIS filed a Rule 56(d) motion, arguing that additional discovery was needed to respond to National Union's arguments regarding the closer-to-the-risk doctrine and the number of occurrences during the mine collapse. As stated, the court declines to apply the closer-to-the-risk doctrine, leaving the remaining issue of the Rule 56(d) motion as whether the mine collapses constituted two separate occurrences under the insurance policies.

Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."[42] The parties agreed that the first phase of the case would be limited to policy interpretation.[43] Yet, National Union urges the court to engage in a fact-intensive analysis concerning whether the mine collapse constituted two occurrences. Both policies define an occurrence as an accident caused by the same general harmful conditions.[44] There has been no discovery in this case on the cause of the mine collapse. In view of this, the court declines to address the occurrences issue at this stage. Factual issues are reserved for the second phase of the case when the parties have the benefit of further discovery.

---

[42] Fed. R. Civ. P. 56(d).
[43] Amended Stipulation and Joint Motion to Modify Scheduling Order (Dkt. 51).
[44] The National Union Policy states, "All such exposure to substantially the same general harmful conditions will be deemed to arise out of one Occurrence." National Union Ins. Policy (Dkt. 63, exh. 1), at 33. The AEGIS Policy states, "All CLAIMS arising out of the same act, accident, event or exposure to substantially the same general conditions shall be deemed to have arisen out of a single 'OCCURRENCE'." AEGIS Policy (Dkt. 63, exh. 2), at 1143.

## CONCLUSION

For the reasons stated, AEGIS's and National Union's motions for summary judgment (Dkt. Nos. 63-64) are GRANTED IN PART and DENIED IN PART and AEGIS's Rule 56(d) Motion (Dkt. 72) is GRANTED IN PART.  The court orders and declares the following:

1. The National Union Policy covers Andalex.

2. AEGIS may seek pro rata reimbursement from National Union for payments made to settle the underlying lawsuit on behalf of Andalex, including any payments Andalex made on behalf of Genwal.

3. The court declines to apply the closer-to-the-risk doctrine and the occurrences issue is reserved for the second phase of the case.

4. Within thirty days, the parties must submit a stipulated proposed scheduling order for the second phase of the case.  If the parties do not reach an agreement, they may submit separate proposed scheduling orders.

SO ORDERED this 19th day of February, 2015.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge

United States District Court
for the
District of Utah
February 20, 2015

******MAILING CERTIFICATE OF THE CLERK******

RE: Associated Electric & Gas Insurance Services Limited v. American International Group et al
    2:11cv368 RJS

Greggory J. Savage
RAY QUINNEY & NEBEKER (SLC)
36 S STATE ST STE 1400
PO BOX 45385
SALT LAKE CITY, UT 84145-0385

Patrick Fredette
MCCORMICK BARSTOW LLP
312 WALNUT ST STE 1050
CINCINNATI, OH 45202

Lejf E. Knutson
MCCORMICK BARSTOW SHEPPARD WAYTE & CARRUTH
5 RIVER PARK PLACE E
PO BOX 28912
FRESNO, CA 93720

_____

Lynsie Severnak,